Filed 11/27/23  P. v. Hampton CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E078739 |
| v. | (Super.Ct.No. FBA01720) |
| MICHAEL HAMPTON, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Tony Raphael, Judge.  Affirmed.

Joanna Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Senior Assistant Attorney General, Collette C. Cavalier, Lynne G. McGinnis and Nora S. Weyl, Deputy Attorneys General, for Plaintiff and Respondent.

1

In 1994, petitioner Michael Hampton participated in a group beating that left the victim dead. Hampton's own participation was relatively minor; he hit the victim in the head some two to four times and kicked him in the body once. By contrast, another member of the group hit or kicked the victim some 30 times, and yet another member hit or kicked him some 50 to 100 times. Moreover, at times, Hampton tried to help the victim. Nevertheless, Hampton was convicted of second degree murder.

In 2019, Hampton filed a petition to vacate the murder conviction pursuant to Penal Code section 1172.6.[1] After considering the trial record, along with Hampton's testimony at subsequent parole hearings, the trial court denied the petition.

In this appeal, Hampton contends:

(1) The trial court erred by admitting Hampton's testimony at postconviction parole hearings.

(2) There was insufficient evidence to support a finding that Hampton was guilty of murder as a perpetrator, because:

(a) There was insufficient evidence that Hampton caused the death.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

The petition was actually filed under former section 1170.95. (Stats. 2018, ch. 1015, § 4, amended by Stats. 2021, ch. 551, § 2.) Effective June 30, 2022, former section 1170.95 was renumbered as section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) We will use section 1172.6, somewhat anachronistically, to refer to whichever one of the two statutes was in effect at the relevant time.

(b)  Even if Hampton did cause the death, there was insufficient evidence that he did so with implied malice.

(3)  The trial court's finding that Hampton was guilty of murder as an aider and abettor who acted with implied malice was based on an invalid legal theory.

(4)  There was insufficient evidence that Hampton aided and abetted murder with implied malice.

(5)  The trial court failed to make the necessary finding of implied malice.

We find no error.  Hence, we will affirm.

I

STATEMENT OF FACTS

A.      *The Source of the Facts*.

The evidence at the evidentiary hearing consisted of the clerk's transcript from the direct appeal, the reporter's transcript of the trial testimony, and the transcripts of Hampton's five parole hearings.

In connection with the prima facie hearing, the People had filed a copy of our opinion in Hampton's direct appeal.  However, it appears that the trial court did not consider that opinion at the subsequent evidentiary hearing.

B.      *Testimony of Richard Campbell*.

Hampton and his fiancée, Kathren Kelley, were homeless.  As of mid-December 1994, they were staying at a campsite in a wash in Barstow.

Richard Campbell testified pursuant to a grant of immunity. He stayed at the same camp for three or four nights. One "Jack" was also staying at the camp.

One day, Campbell, Jack, and victim Michael Brandolino were at a McDonald's. The victim was also homeless. He had an Aryan Nation tattoo. Jack was an Aryan Nation member and had the same tattoo. He got upset that the victim had it. Jack left but came back with Hampton.

Jack "verbal[ly] assault[ed]" the victim. Hampton told Campbell, "[Y]ou might not want to see this." Jack then punched the victim in the temple several times.

The same day or the next, Hampton, Kelley, and Campbell were all at the camp when Jack, Coffey, and the victim arrived. All except Kelley drank beer and/or vodka. The victim was more drunk than the others, to the point where he could not walk straight.

Once again, Jack got upset with the victim. However, the victim did not react, and Jack calmed down.

Campbell left the camp to get water. When he got back, Jack and Coffey were beating the victim.[2] Coffey was "half[-]hearted" at first but "got more violent." Jack was "more vicious." As the beating went on, it "looked like a frenzy." Most of the time, the victim was on the ground.

Hampton seemed "somewhat shocked" by the beating. Nevertheless, he just "stood around and watched."

---

**2** Campbell was inconsistent about whether Coffey had already joined in the beating or whether he joined in 10, 20, or 30 minutes after Campbell came back from getting water.

4

Some 30 to 60 minutes into the beating, the victim called Hampton "a dirty red skin." Hampton was half-Native American. This "seemed to infuriate" Hampton (and Jack and Coffey as well).

The victim also called Kelley a "bitch." She slapped him. Hampton said, "You can't call my wife a bitch." Hampton punched the victim twice. When the victim was on all fours, he also kicked him, in either the butt, hip, or ribs. This all occurred within about 15 seconds.[3]

About 30 minutes after the beating started, Hampton asked Campbell, "You don't like this much, do you?" Campbell replied, "No. I wish you would stop it." Hampton told Jack and Coffey to stop, and they did.

Hampton told the victim he could leave. At that point, the victim "might have [had] a few bruises about his face, but other than that, he was in pretty good shape . . . ." He walked 30 or 40 yards away, then "said something about going to the police."

---

[3]     Campbell was inconsistent about whether Hampton hit and kicked the victim before or after the victim was hogtied. (See *post*.)

Jack and Coffey "went and got him again brought him back."[4]  They hogtied him.[5]  After about 20 minutes, they started hitting and kicking him again.[6]  Hampton tried to stop them, but he came back and told Campbell, "I can't stop them.  They're going crazy."

The beating lasted "off and on, about an hour and a half . . . to two hours."  Jack hit or kicked the victim a total of 50 to 100 times.  Coffey hit or kicked him a total of approximately 30 times.  During breaks in the beating, the victim was "incapacitated" and "didn't move."  There was "a lot of blood" coming from his nose and mouth.

Hampton told the others to untie the victim, and they did.[7]  Jack poured water on his head and told him it was gasoline; the victim screamed.  After that, he was "pretty much incapacitated."

When it started to get dark, Jack and Coffey carried or dragged the victim away from the camp area.  Jack said something about putting him on the railroad tracks.

---

**4**        Campbell testified that Hampton told them, "[G]o get him."  However, he was confronted with the transcript of the preliminary hearing, in which he had testified, "I don't know if he did, or they went on their own.  I do not remember."  He then agreed that he did not know.

**5**        Campbell testified — and had also told police — that Hampton said, "[T]ie him up."  However, he also testified, "I don't know that he specifically asked [them] to tie him up."  "I'm not really sure who came up with the idea . . . ."

**6**        At the preliminary hearing, Campbell had testified that Hampton, as well as Jack and Coffey, hit the victim after he was hogtied.

**7**        Campbell was inconsistent with respect to (1) whether the victim was tied up before or after he temporarily left the camp, or both; and (2) whether Jack and Coffey beat him after he was untied.

6

Hampton, Kelley, and Campbell went inside a tent. Campbell did not see Coffey again. Jack came back, however, and Hampton went out to talk to him. Jack said, "It is done."

Hampton was "very upset." He said something like, "If you've done this, you need to bury him." "That's the least you can do." Campbell did not view this as an order.

Hampton went to look at the victim; when he came back, he said he was dead. Kelley and Campbell also went to look at the victim. He appeared to be dead. Jack took a shovel, left the camp for 10 or 15 minutes, came back with the shovel, then left for good. At dawn the next morning, Hampton, Kelley, and Campbell left the camp.

In Campbell's opinion, Hampton did not have anything to do with the victim's death.

C.    *Testimony of Kathren Kelley.*

Kelley testified pursuant to a grant of immunity. She admitted prior convictions for petty theft and prostitution.

At the camp, Jack punched the victim once in the face because he said "something smart."

Kelley went to get firewood and was gone for about 25 minutes. After she got back, the victim said something about "stinking Indians."[8] Jack and Coffey started punching the victim; when he fell to the ground, they started kicking him.

Hampton punched him two, three, or four times, in the face and head, and kicked him once, in the butt, all within a minute and a half or less. Hampton then walked away. Jack and Coffey went through the victim's pockets; Coffey took a dollar from his wallet. The victim tried to get up, but Jack and Coffey would not let him; they said, "You're not going nowhere."

Kelley agreed with Campbell, however, that at some point, the victim started to leave "under his own power," then said he was going to the police. Jack and Coffey hogtied him and started kicking him again. After about 10 minutes, Hampton told them to untie him, and they did. Hampton put a blanket over him.

The beating continued, off and on, for two or three hours. Hampton tried to stop it two or three times. Kelley denied hitting the victim.

Jack and Coffey discussed taking the victim to the railroad tracks "and let[ting] it look like a railroad train hit him." They told him, "You're going to see Uncle Pete," meaning the Union Pacific. Hampton was not present during this conversation. They dragged him around some bushes and out of Kelley's sight.

---

**8** Kelley was inconsistent as to whether the "stinking Indian" remark precipitated the beating or occurred after it had already started.

Hampton either went with them or followed them to see what was going on.  A few minutes later, Kelley also followed.  Behind the bushes, the victim was lying on his back.  Jack was sitting on his feet, and Coffey was sitting on his chest (or vice versa).  Hampton was standing a couple of feet away from his head; then he squatted down.  Jack said, "[G]et the fuck out of [here]," so Kelley went back to camp.

Either seconds or minutes later, Hampton came back.  He was upset.  He said, "They killed him."  Five or 10 minutes after that, Jack and Coffey came back.  Jack said, "It was our first kill."  All three had blood on their hands.  Jack and Coffey left to wash their hands.

While they were gone, Kelley and Campbell went to check on the victim.  He appeared to be dead.  When Jack and Coffey got back, they buried him.  Jack then left.  Kelly did not see Coffey again.  Hampton, Kelley, and Campbell left the camp at sunrise the next morning.

D.    *Kelley's Statement to the Police*.

In Kelley's second statement to the police,[9] she told them that when the beating started, she said, "I'm getting the hell on out of here."  Hampton replied, "You're not goin' nowhere."  At one point, the victim said, "I'm leavin'," "And then Jack and

---

[9]    A redacted version of Kelley's first statement to the police was played for the jury, but it was not introduced at the section 1172.6 hearing.  By contrast, an unredacted version was not played for the jury but was introduced at the section 1172.6 hearing.

Because there was no objection to the unredacted version, the trial court could properly consider it.  However, it added nothing relevant to Kelley's second statement.

9

[Coffey] started beating and kicking him again and [Hampton] started kicking him . . . ." "They were all kicking" the victim "[i]n the ribs, butt, back, chest, face . . . ." Jack, Coffey, and Hampton all discussed what to do with the victim; "they" decided to leave him on the railroad tracks.

E.    *Physical Evidence*.

On December 29, 1994, a passerby discovered the victim's body. The condition of the body was consistent with a date of death sometime between December 14 and 29.

The victim had been beaten to death. There was bleeding inside the skull, both on the outside of the brain and deep inside the brain. The Adam's apple was broken and bleeding. There were 14 broken ribs. One of the broken ribs had torn the liver. Some of the ribs were broken while the victim was still alive. The liver tear, however, occurred after he was in shock or already dead. There were bruises on many areas of the body, but especially on the head. Scrapes on the back indicated that he had been dragged.

Although there was no single blow that was the cause of death, the head injuries collectively were fatal. Once the deep brain injuries were inflicted, the victim would have lost consciousness; it would have taken him from minutes to hours to die. His blood alcohol level was 0.28 percent.

F.    *Hampton's Testimony at His Parole Hearings*.

1.    *2015 parole hearing*.

At his 2015 parole hearing, when asked when he was an alcoholic, Hampton replied, "Around the time that I killed [the victim]." After Jack and Coffey beat the

10

victim, Hampton helped him up, but the victim called him "a stinking F-ing Indian" and called Kelley a "bitch." Hampton "just snapped" and hit him.

He admitted that the victim's death "was caused by my hand hitting him in the forehead. I killed him. Those guys didn't." A panel member noted that he could not have caused all of the victim's extensive injuries. Hampton responded that his single blow caused the deep brain injuries, which were fatal: "I hit him too hard." "[H]e disrespected me, and I killed him."

### 2. *2017 parole hearing*.

At his 2017 parole hearing, Hampton's testimony generally tracked Campbell and Kelley's testimony at trial. However, he admitted that, after Jack's first punch, he was the next to strike the victim. The victim called him a "stinking [r]edskin," so he hit the victim in the head three times and kicked him once. About 20 minutes later, Jack and Coffey started the main beating. He also admitted that, when the victim said he was going to call the police, he told the others to go get him.

### 3. *2018 parole hearing*.

At his 2018 parole hearing, Hampton testified that he punched the victim because he called him a "stinking Indian"; then "we all just started hitting him, kicking him," for "two hours off and on." However, he also maintained that he only punched the victim "one to three times," including once in the ribs, and kicked him once. Again, he admitted saying, "[G]o get him."

11

## II

## STATEMENT OF THE CASE

In 1995, petitioner and Coffey were tried before the same jury. The jury was instructed on first degree deliberate and premeditated murder; second degree express malice murder; second degree implied malice murder; and aiding and abetting. It was not instructed on the natural and probable consequences doctrine or on the felony-murder rule.

Petitioner was found guilty of second degree murder. (§ 187, subd. (a).) He was sentenced to 15 years to life in prison. He appealed; we affirmed. (*People v. Coffey, et al.* (Sep. 21, 1998, E019538) [nonpub. opn.].)

In 2019, petitioner filed a petition to vacate the murder conviction pursuant to section 1172.6. The trial court found a prima facie case and set an evidentiary hearing. At the evidentiary hearing, the prosecution asserted that Hampton had not even shown a prima facie case. After the evidentiary hearing, the trial court denied the petition. It found: "[T]he People have proven beyond a reasonable doubt that Hampton was the actual killer or that he was an aider and abettor who facilitated the killing . . . with personal disregard for human life." It also found "that Hampton, at a minimum, aided and abetted . . . in the beating death . . . ."

12

III

SECTION 1172.6

Effective January 1, 2019, the Legislature eliminated the natural and probable consequences rule as applied to murder.  It also restricted the scope of the felony-murder rule.  (Stats. 2018, ch. 1015.)

Specifically, it amended section 188 so as to provide that, except as permitted by the felony-murder rule, "in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime."  (§ 188, subd. (a)(3).)

It also amended section 189 so as to provide that the felony-murder rule (§ 188, subd. (a)) applies to a person only if:

"(1)  The person was the actual killer.

"(2)  The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.

"(3)  The person was a major participant in the underlying felony and acted with reckless indifference to human life . . . .

"[(4)  T]he victim is a peace officer who was killed while in the course of the peace officer's duties, where the defendant knew or reasonably should have known that the victim was a peace officer engaged in the performance of the peace officer's duties."  (§ 189, subds. (e), (f).)

13

At the same time, the Legislature enacted section 1172.6. It requires the trial court to vacate a murder conviction that may have been based on either a natural and probable consequences or a felony-murder theory, unless it finds, beyond a reasonable doubt, that the petitioner is still guilty of murder under current law. (§ 1172.6, subd. (d)(3).)

Second degree murder is defined as requiring either express or implied malice. (§§ 187, subd. (a), 188, subd. (a).) "[E]xpress malice requires an intent to kill." (*People v. Delgado* (2017) 2 Cal.5th 544, 571; see § 188, subd. (a)(1).) "'[I]mplied malice has both a physical and a mental component, the physical component being the performance "'of an act, the natural consequences of which are dangerous to life,'" and the mental component being the requirement that the defendant "'knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life.'"' [Citation.]" (*People v. Taylor* (2004) 32 Cal.4th 863, 868.)

IV

PRIMA FACIE CASE

After our initial review of the record, we questioned whether Hampton even made a prima facie case. As mentioned, the jury was not instructed on either felony murder or the natural and probable consequences doctrine. To be eligible for vacation of a murder conviction under section 1172.6, a petitioner must have been "convicted of [1] felony murder or [2] murder under the natural and probable consequences doctrine or [3] other theory under which malice is imputed to a person based solely on that person's participation in a crime . . . ." (§ 1172.6, subd. (a).) If the record shows that the jury was

14

not instructed on any of these theories, the petitioner is ineligible for relief as a matter of law.  (*People v. Harden* (2022) 81 Cal.App.5th 45, 52; *People v. Cortes* (2022) 75 Cal.App.5th 198, 205.)

We therefore called for supplemental briefing.  In it, Hampton argued that the jury was erroneously instructed that he could be guilty of second degree murder on an implied malice theory, as long as he intended to aid and abet an assault on the victim, even if he did not consciously disregard the risk to human life.  He contended that this erroneous theory was, in effect, a theory under which malice is imputed to a person based solely on that person's participation in a crime.  He relied primarily on *People v. Langi* (2022) 73 Cal.App.5th 972 (*Langi*).  The People responded that *Langi* was poorly reasoned and urged us not to follow it.

On further consideration, we find that the question is difficult and unclear.  If we were to agree with the People, we could resolve the case on this issue alone.  However, if we were to agree with Hampton, we would still have to reach all of the other issues.  As it happens, although there are multiple such issues, they turn out to be easier to resolve — even collectively — than the single issue of whether to follow *Langi*.

Accordingly, even though we raised the issue on our own motion, we have decided not to decide it.

## V

## ADMISSIBILITY OF HAMPTON'S STATEMENTS IN HIS PAROLE HEARINGS

Hampton contends that the trial court erred by admitting his statements at his parole hearings.

A.      *Additional Factual and Procedural Background.*

The prosecution introduced the transcripts of Hampton's parole hearings. Hampton's counsel objected to them as hearsay, lacking foundation, unreliable, and irrelevant. He argued that Hampton's statements in them were not credible, because he had been told he would not be paroled unless he took full responsibility. Counsel asked the trial court "to either not consider the records from the parole board hearings or to . . . consider those records f[rom] the parole board hearings with a whole lot less weight than the actual evidence in the case."

The trial court overruled these objections. It explained: "[T]he Court finds . . . that the transcripts from the parole hearings are admissible on the basis that they contain sufficient indicia of reliability. [Citation.] Additionally, transcripts of parole hearings are 'new or additional evidence' under Section 117[2.6, subdivision] (d)(3). [Citation.] . . . The Court notes that even without the transcripts from the parole hearings, the evidence from Hampton's preliminary hearing and trial show beyond a reasonable doubt that Hampton was an aider and abettor who acted as a major participant and facilitated the killing . . . with personal disregard for human life."

B.    *Discussion*.

In this appeal, Hampton does not reiterate his objections that the transcripts were hearsay, lacked foundation, or were irrelevant.  He argues only that (1) "[t]hey should be deemed inadmissible under the judicially devised exclusionary remedy of *People v. Coleman* (1975) 13 Cal.3d 867 (*Coleman*)" and (2) they "lacked reliability."  We limit our consideration to these arguments.

Hampton forfeited his objection based on *Coleman* by failing to raise it below. (Evid. Code, § 353, subd. (a); *Coleman*, *supra*, 13 Cal.3d at p. 889 [requiring timely objection].)

Even aside from forfeiture, it lacks merit.  In *Coleman*, the Supreme Court held, in the exercise of its supervisory powers, that a probationer's testimony at a probation revocation hearing, when offered in a subsequent trial on the offense that was the basis of the revocation, was inadmissible as substantive evidence (though admissible to impeach). (*Coleman*, *supra*, 13 Cal.3d at p. 889.)  It did so because otherwise, there was an irreconcilable conflict between a probationer's due process right to testify at the revocation hearing and the probationer's right against self-incrimination in the criminal proceeding.  (*Id*. at pp. 873-878.)  However, it declined to hold that the rule it declared was constitutionally compelled.  (*Id*. at pp. 878-889.)  It also stated:  "We . . . wish to make clear that this exclusionary rule does not apply to any proceedings other than the formal, dispositive probation revocation hearing."  (*Id*. at p. 894.)

17

We do not write on a blank slate. Several cases have held that *Coleman* does not bar the introduction of a defendant's parole hearing transcript at an evidentiary hearing under section 1172.6. (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 586-590; *People v. Anderson* (2022) 78 Cal.App.5th 81, 89-93; *People v. Myles* (2021) 69 Cal.App.5th 688, 704-706.) The crux of their holdings is that, in a section 1172.6 proceeding, there is no constitutional right against self-incrimination; thus, there is no such irreconcilable conflict as there was in *Coleman*. We agree with the reasoning in these cases.

Although Hampton also argues that his statements were unreliable, he cites no authority making unreliable statements inadmissible for that reason alone. Instead, he analogizes to accomplice testimony. However, while accomplice testimony must be corroborated (Pen. Code, § 1111) and must be viewed with caution when it tends to incriminate the defendant (*People v. Guiuan* (1998) 18 Cal.4th 558, 569), it is admissible. He also analogizes to a statement by an accused that is an attempt to "'shift blame or curry favor,'" rather than "'truly self-inculpatory,'" which is not admissible under the hearsay exception for declarations against penal interest. (See *People v. Duarte* (2000) 24 Cal.4th 603, 611.) However, this follows from the specific requirement of that hearsay exception "that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.)

"Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.) Hampton has not pointed to any applicable statutory (or nonstatutory) exception. Accordingly, the transcripts were properly admitted.

In his reply brief, Hampton shifts his position — he contends that his statements "lack the reliability needed to support a murder conviction . . . ." In other words, they are not substantial evidence. He forfeited this argument by failing to raise it in his opening brief. (See *People v. Clark* (2016) 63 Cal.4th 522, 552.)

In any event, "it is not for us to say on appeal whether [he] was worthy of the [court]'s belief. Nothing to which [he] testified was physically impossible or even implausible. 'If the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.' [Citation.] 'Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' [Citation.]" (*People v. Jones* (2013) 57 Cal.4th 899, 963.)

Last but not least, the asserted error was harmless. The trial court specifically said: "[E]ven without the transcripts from the parole hearings, the evidence from Hampton's . . . trial show beyond a reasonable doubt that Hampton was an aider and abettor who . . . facilitated the killing . . . with personal disregard for human life." Moreover, in discussing the sufficiency of the evidence, we do not rely on any of Hampton's statements at the parole hearings.

# VI

## THE SUFFICIENCY OF THE EVIDENCE TO SUPPORT

## THE THEORY THAT HAMPTON WAS GUILTY AS A PERPETRATOR

Hampton contends that there was insufficient evidence that he was guilty as a perpetrator[10] for two reasons:  First, because there was insufficient evidence that his punches caused the victim's death; and second, because there was insufficient evidence that, when he punched the victim, he acted with implied malice.

We need not decide either question.  It is true that the trial court made a finding that he was either a perpetrator or an aider and abettor.  Elsewhere in its statement of decision, however, it made a finding "that Hampton, at a minimum, aided and abetted . . . the beating death . . . ."  It also made a finding "beyond a reasonable doubt that Hampton was an aider and abettor who acted as a major participant and facilitated the killing . . .

---

**10**      The trial court used the term "actual killer."  Whether a person is an actual killer is relevant to whether he or she can still be found guilty under the felony-murder rule.  (§ 189, subd. (e)(1).)  It is not relevant to whether he or she can still be found guilty of second degree murder.  For that purpose, what matters is whether the person (1) either perpetrated or aided and abetted a killing (§ 31), and (2) did so with either express or implied malice (§ 188).

At first glance, an actual killer might appear to be the same thing as a perpetrator.  This might ultimately turn out to be the law.  At present, however, it is not clear whether a person who is a concurrent cause of death — for example, one who fired shots at the victim at the same time as others were doing so — is necessarily an actual killer.  (See *People v Carney* (2023) 14 Cal.5th 1130, 1137-1146; see also *People v. Garcia* (2020) 46 Cal.App.5th 123, 151-154; but see *People v. Garcia* (2022) 82 Cal.App.5th 956, 966-971.)  Here, if Hampton was a perpetrator at all, it is because he was a concurrent cause of death.  We therefore stick to the term "perpetrator."

20

with personal disregard for human life." In other words, it found that he was *definitely* guilty as an aider and abettor, even though he *might* also be guilty as a perpetrator.

And this finding was proper. "[T]he dividing line between the actual perpetrator and the aider and abettor is often blurred. It is often an oversimplification to describe one person as the actual perpetrator and the other as the aider and abettor. When two or more persons commit a crime together, both may act in part as the actual perpetrator *and* in part as the aider and abettor of the other, who also acts in part as an actual perpetrator." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1120.) Thus, the trial court's finding that Hampton was guilty as an aider and abettor was not inconsistent with its finding that he *might* also be guilty as a perpetrator.

Accordingly, we do not consider the sufficiency of the evidence that Hampton was guilty as a perpetrator.

VII

THE VALIDITY OF A THEORY OF

AIDING AND ABETTING MURDER WITH IMPLIED MALICE

Hampton contends that the trial court's finding that he was guilty of murder as an aider and abettor who acted with implied malice was based on an invalid legal theory. In his view, to be guilty of second degree murder as an aider and abettor, one must act with *express* malice.

He acknowledges that there is case law supporting a theory of aiding and abetting murder with implied malice, citing *People v. Langi*, *supra*, 73 Cal.App.5th 972 and

21

*People v. Powell* (2021) 63 Cal.App.5th 689. He also cites the Supreme Court's opinion in *People v. Gentile* (2020) 10 Cal.5th 830, though he describes it as "dictum." However, he urges us not to follow these cases.

These are far from the only cases so holding. When he filed his opening brief, there was also *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 587–591, review granted July 27, 2022, review dism. May 31, 2023, S274792; *People v. Cortes*, *supra*, 75 Cal.App.5th at p. 205, and *People v. Superior Court* (*Valenzuela*) (2021) 73 Cal.App.5th 485, 499-504.

After he filed his opening brief, even more such cases came down. However, we need cite only one of them: In *People v. Reyes* (2023) 14 Cal.5th 981, the Supreme Court held squarely that aiding and abetting murder with implied malice is a valid theory. (*Id*. at pp. 990-991.) This requires us to reject Hampton's present contention.

VIII

THE SUFFICIENCY OF THE EVIDENCE OF

AIDING AND ABETTING WITH IMPLIED MALICE

Hampton contends that there was insufficient evidence that if he was an aider and abettor he acted with implied malice.

"We review the trial judge's fact finding for substantial evidence. [Citation.]" (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.) "'[W]e must examine the record independently for "'substantial evidence — that is, evidence which is reasonable, credible, and of solid value'" that would support a finding beyond a reasonable doubt.'

22

[Citation.] We must 'review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. [Citation.] . . . [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence. [Citation.] . . .' [Citation.]" (*People v. Montanez* (2023) 91 Cal.App.5th 245, 270.)

"[T]o be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering act . . . . The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life.' [Citations.]" (*People v. Reyes*, *supra*, 14 Cal.5th at p. 991, italics omitted.)

Hampton's first acts that could constitute aiding and abetting were to punch the victim two to four times in the face and head and kick him once. At this point, according to Campbell, Jack and Coffey had already been beating him, off and on, for 30 to 60 minutes. Jack was "vicious"; Coffey became "violent." "[B]oth [Coffey] and Jack were going at it pretty good . . . ." It "looked like a frenzy." Hampton had been standing there and watching. Thus, he knew he was joining in a severe beating. It is inferable that he was subjectively aware that the beating endangered the victim's life, and that he acted with a conscious disregard for life,

23

Admittedly, thereafter, he stopped the beating and told the victim he could leave. Tragically, the victim said he was going to call police. Hampton then said, "[G]o get him," another act of aiding and abetting.

At the preliminary hearing, Campbell did not remember whether Hampton said this; moreover, when confronted at trial with his preliminary hearing testimony, he agreed that he did not remember. Nevertheless, the trial court could conclude that he was not making up this statement out of whole cloth.[11] "'"Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends."' [Citation.]" (*People v. Montanez*, *supra*, 91 Cal.App.5th at p. 270.)

Finally, Campbell also testified that Hampton said, "[T]ie him up." Again, even though Campbell equivocated about this, the trial court was entitled to believe it. Moreover, while Kelley did not testify to either of these statements, she was still engaged to Hampton at the time of trial, so she had a motive to "forget" them.

When Hampton said, "Go get him," and "Tie him up," it is fairly inferable that he knew the beating would resume. Moreover, as discussed, he had every reason to expect that it could be deadly. However, he considered a potentially deadly beating to be a

---

[11] At both the 2017 and 2018 parole hearing, Hampton admitted saying, "Go get him." As we have already held (see part V, *ante*), this was admissible. Even without it, however, Campbell's testimony that Hampton said this was substantial evidence.

24

better alternative to police involvement.  Indeed, it is inferable that he *intended* that Jack and Coffey kill the victim, so the victim could *never* call the police.[12]

Hampton argues that there was no evidence he was subjectively aware of a danger to *human life*.  We agree that subjective awareness of a danger of *serious bodily injury* is not enough.  (See *People v. Knoller* (2007) 41 Cal.4th 139, 153-156.)  However, a trier of fact is "entitled to infer [a] defendant's subjective awareness that his conduct endangered . . . life from the circumstances of the attack alone, the natural consequences of which were dangerous to human life.  [Citation.]"  (*People v. Cravens* (2012) 53 Cal.4th 500, 511.)  As the court in *People v. Moore* (2010) 187 Cal.App.4th 937 said of the defendant's drunk driving, "Whether [the defendant] was subjectively aware of the risk is best answered by the question: how could he not be?  It takes no leap of logic for the jury

---

[12]     We accept that after Hampton's first three punches and single kick, he did not strike the victim again.  Kelley did tell the police that "[t]hey were all kicking" the victim, and that "all" included Hampton.  However, this is a description of the entire two-hour beating; it is consistent with her testimony that Hampton kicked the victim only once.

Kelley also testified that when Hampton came back, after squatting by the body, there was blood on his knuckles.  However, it would be unreasonably speculative to conclude that he had just punched the victim.  The victim was already unconscious and unresisting.  The blood could have been from punching him earlier.

Finally, at his 2018 parole hearing, Hampton admitted that "we all just started hitting him, kicking him," for "two hours off and on."  He made it clear, however, that his participation consisted of up to three punches and one kick.

The People point out that Campbell went for water during the beating and might not have seen any further blows.  However, this is not evidence that there actually were further blows.

to conclude that because anyone would be aware of the risk, [the defendant] was aware of the risk." (*Id*. at p. 941.)

It is true that Hampton tried, unsuccessfully, to stop the beating. Moreover, he told Jack and Coffey to untie the victim, and he put a blanket over him. When he learned that the victim was dead, he was very upset. However, he had *already* aided and abetted the beating, while acting with implied malice. These later acts did not constitute a withdrawal, because he did not do everything in his power to prevent the death of the victim. (See *People v. Jackson* (1996) 13 Cal.4th 1164, 1221.) At most, he showed remorse.

In sum, there was substantial evidence that Hampton aided and abetted murder with implied malice.

IX

FAILURE TO FIND IMPLIED MALICE

Hampton contends that the trial court failed to make a finding of implied malice. In his view, to the extent that it found that he was the perpetrator, it failed to find malice at all; and to the extent that it found that he was an aider and abettor, it found only that he acted with "personal disregard," which he contends is not implied malice.

The trial court found that Hampton "was the actual killer or . . . was an aider and abettor who facilitated the killing . . . with personal disregard for human life." Thus, grammatically, the finding of "personal disregard" is attached to the finding that he "was an aider and abettor" and not to the finding that he "was the actual killer." As discussed

26

in part VI, *ante*, however, the trial court found that Hampton was guilty as an aider and abettor. Any error in its alternative finding that he was (or, more accurately, that he might also be) guilty as a perpetrator would be harmless.

Hampton argues, however, that the trial court's finding of *"personal* disregard" shows that it did not find implied malice at all. Implied malice requires *conscious* disregard for life. (*People v. Taylor*, *supra*, 32 Cal.4th at p. 868.) Obviously, however, by "personal," the trial court meant "subjective," i.e., "conscious."

Under this heading, Hampton also says, "Implied malice . . . requires proof that the defendant acted with a conscious disregard of the danger to life. A conscious disregard of the risk of great bodily injury does not suffice." However, the trial court specifically found "personal disregard *for human life*." (Italics added.)

In sum, the trial court did find that Hampton aided and abetted with implied malice.

X

DISPOSITION

The order appealed from is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

FIELDS
J.

RAPHAEL
J.

27